IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BOYDSTUN METAL WORKS, INC.                           CV. 06-500-PK
                          Plaintiff,

                                                     FINDINGS AND
                                                     RECOMMENDATION
v.


COTTRELL, INC.,
                          Defendant.
_____

PAPAK, Magistrate Judge:

        Plaintiff Boydstun Metal Works, Inc. ("Boydstun")  filed this action accusing defendant

Cottrell, Inc. ("Cottrell") of patent infringement under 35 U.S.C. § 271.  Before this court is

Cottrell's motion for summary judgment and Boydstun's cross motion for summary judgment.

This court has jurisdiction pursuant to 28 U.S.C. § 1331.  For the reasons set forth below, this

court recommends denying Cottrell's motion for summary judgment (#71) and granting

Boydstun's cross motion for summary judgment on Cottrell's on sale bar affirmative defense

(#81).

        As a procedural matter, this court notes that based on the agreement of all parties at the

status conference held on February 2, 2007, this case will be transferred to Judge Brown to be

managed alongside CV 06-1406-BR.

LEGAL STANDARD

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" Fed. R. Civ. P. 56(c); <u>Nike, Inc. v. Wolverine World Wide, Inc.</u>, 43 F.3d 644, 646 (9th Cir. 1994) ("summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.").

The moving party carries the initial burden of proof. The party meets this burden by identifying portions of the record on file which demonstrate the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the non-moving party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. <u>Id.</u>

The court must view the evidence in the light most favorable to the non-moving party. <u>Bell v. Cameron Meadows Land Co.</u>, 669 F.2d 1278, 1280 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. <u>Hector v. Wiens</u>, 533 F.2d 429, 432 (9th Cir. 1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Valadingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. <u>Sankovich v. Ins. Co. of N. Am.</u>, 638 F.2d 136, 140 (9th Cir. 1981).

Page 2 - FINDINGS AND RECOMMENDATION

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322-23; see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989).  The non-moving party may not rest on conclusory allegations or mere assertions, see Taylor, 880 F.2d at 1045; Leer v. Murphy, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Taylor, 880 F.2d at 1045.

When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but mererly to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249; Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the non-moving party.  Fed. R. Civ. P. 56; Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).  Summary judgment, of course, may not be granted where the court finds unresolved issues of material fract, even in situations where the cross motions allege that no disputed facts exist.

FACTUAL BACKGROUND

Cottrell and Boydstun design and manufacture car-hauling equipment, including vehicle transporters also known as car haulers.  Most of these haulers feature both a headramp that attaches to a truck cab, and a trailer that attaches to the head ramp via a fifth wheel.  Car haulers store cars on two levels:  an upper level and a lower level.  The headramps and trailers have moveable decks or platforms onto which cars are loaded and secured for transport.  During loading and unloading, the decks or platforms are adjusted, i.e. they are raised, lowered, and articulated.  These adjustments are made using different types of devices, including hydraulic cylinders and various forms of screw devices.

A conventional hydraulic cylinder is a telescoping device that extends and retracts with the application of hydraulic pressure.  One end of the hydraulic cylinder is attached to one of the decks and moves the deck as the cylinder extends and retracts.  One form of screw device is a power screw mechanism.  These power screw mechanisms include a screw shaft, bearings, and one or more traveling nuts.  The power screw mechanisms are powered by motors.  As the screw turns, the nut travels up and down the screw, thereby adjusting the deck of the car hauler.  These screw devices can be mounted in various orientations within a car hauler.

Another means of adjusting the decks of a car hauler is using a locking cylinder[1] which includes a teletube assemply that consists of a tube within a tube.  The locking cylinder has a threaded screw shaft and a rod piston assembly that is in threaded engagement with the screw shaft.  As hydraulic pressure is applied to the rod piston assembly, it moves freely along and

---

[1]Cottrell describes this as "Cottrell's patented locking cylinder".  <u>See</u> Cottrell's Memorandum in Support of its Motion for Summary Judgment at 3.

unscrews from the screw shaft.  As the pressure is removed, the rod piston retracts slightly until a notch on the screw shaft engages an internal locking rod located inside the outer tube.

Another screw device used to adjust the decks on a car hauler is what Boydstun refers to as a screw actuator and what Cottrell refers to as a telescrew.  The telescrew and screw actuator are the subject of this lawsuit.

Boydstun describes its screw actuator as follows:  as opposed to hydraulic actuators, screw actuators for vehicle transporters use a screw in lieu of hydraulic pressure to extend and retract the actuator which raises or lowers the platform.  The screw is commonly turned by a hydraulic motor.  The actuator will maintain its position even when there is a complete loss of hydraulic pressure to the motor, such that pinning, a process using manually inserted pins through holes in a hydraulic actuator, is not necessary.

Cottrell describes its telescrew as follows:  the telescrew functions to lift and reposition vehicle decks relative to the frame of the trailer.  The telescrew includes telescoping inner and outer tubes, with a nut positioned in the inner tube.  A screw is threaded into the nut and located in the interior of the inner tube.  A motor and coupling elements are located within the outer tube, such that the shaft of the motor is coupled to and in-line with the screw shaft.

On March 29, 2004, Boydstun filed U.S. Patent Application No. 10/812,748 on its screw actuator innovation.  The '748 Application was published by the U.S. Patent and Trademark Office ("PTO") on September 29, 2005.  The '748 Application matured into U.S. Patent No. 7,025,547 ("the '547 patent"), entitled "Vehicle Transporter with Screw Actuators", and was issued by the PTO on April 11, 2006, and assigned to Boydstun.

Also on April 11, 2006, Boydstun filed suit against Cottrell, alleging that Cottrell's

Page 5 - FINDINGS AND RECOMMENDATION

manufacture and sale of vehicle haulers covered by the '547 patent constituted patent infringement.  On June 9, 2006, Boydstun filed a motion for preliminary injunction but later withdrew that motion.  Thereafter, Cottrell moved for summary judgment on patent claims 1-26, arguing that Cottrell's telescrew does not infringe Boystun's '547 patent, and on claims 27-29, claiming that Boydstun's patent is invalid because (1) Cottrell offered the invention for sale more than one year before Boydstun filed its application, and (2) Cottrell conceived of using screw actuators in car haulers first.  Boystun filed a cross-motion for summary judgment, claiming that Cottrell did not offer its telescrew for sale more than one year before their application for the '547 patent.

ANALYSIS

I.    Cottrell's Motion for Summary Judgment is moot as to Claims 18-26 and 28

Claim 18 of the '547 patent describes the composition of the screw actuator.  See Exh. A to Boydstun's complaint.  Claims 19 through 26 variously depend from independent claim 18 and further describe the various elements of the screw actuator.  Claim 28 also describes the composition of the screw actuator.  In its first brief, Boydstun explains that it disclaimed claims 18-26 and 28 on October 9, 2006.  See Boydstun's Brief in Opposition to Cottrell's Motion for Summary Judgment at 6, citing Pellikaan Decl.  Under 35 U.S.C. § 253, a patentee may disclaim certain patented claims.  Here, Boydstun has disclaimed claims 18-26 and 28 and Cottrell has not alleged that such disclaimer is improper.  Therefore, Cottrell's motion for summary judgment on Boydstun's claims 18-26 and 28 should be denied as moot.

///

///

Page 6 - FINDINGS AND RECOMMENDATION

II.    Additional Discovery is Necessary for Claims 1-17

Cottrell contends that it does not infringe claims 1-17 of the '547 patent because those claims specify the use of a guide and Cottrell's telescrew does not use a guide.  At oral argument, Boydstun moved to continue the motion for summary judgment under F. R. Civ. P. 56(f), and stated that it will not continue to assert claims 1-17 if Cottrell's telescrew does, in fact, lack a guide or the functional equivalent of a guide.  Discovery in this case was previously limited to claim 29 on Boydstun's motion for a preliminary injunction.  Boydstun's Rule 56(f) motion is granted.  Cottrell's motion for summary judgment as to claims 1-17 is continued for sixty (60 days) from the date of this decision and the parties will have that period to engage in limited discovery on the issue of whether Cottrell's telescrew uses a guide or the functional equivalent of a guide, so that Boydstun can determine whether it will withdraw its allegations of infringement of claims 1-17.

III.    The On Sale Bar

A patent is invalid if the claimed invention was sold or offered for sale more than one year prior to the filing date.  35 U.S.C. § 102(b).  This is known as the on sale bar.  Here, the '547 Patent issued from an application filed by Boydstun on March 29, 2004.  Thus, for the purposes of the on sale bar, the critical date is March 29, 2003.  The on sale bar is triggered if two conditions are met by the critical date: (1) the invention was offered for sale, and (2) the invention was ready for patenting.  Pfaff v. Wells Elecs., 525 U.S. 55, 67 (1998).  If both conditions are met, the court must determine whether the subject matter of the offer for sale embodies the claims of the patent.  Scaltech, Inc. v. Retec/Tetra, L.L.C., 269 F.3d 1321, 1329

Page 7 - FINDINGS AND RECOMMENDATION

(Fed. Cir. 2001).

The challenger of a patent must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell. Group One v. Hallmark Cards, Inc., 254 F.3d 1041, 1045-46 (Fed. Cir. 2001).  As stated previously, on cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the non-moving party.  Fed. R. Civ. P. 56; Fair Housing Council, 249 F.3d at 1136.  Summary judgment, of course, may not be granted where the court finds unresolved issues of material fact, even in situations where the cross motions allege that no disputed facts exist.  For the following reasons, Cottrell's motion for summary judgment on the on-sale bar should be denied, and Boydstun's cross-motion for summary judgment on the on-sale bar should be granted.

A.    Offered for Sale

An invention is offered for sale when the device is subject to a commercial offer that, if accepted, would form a binding contract. Scaltech, 269 F.3d at 1328.  The question of whether the invention is the subject of a commercial offer is a matter of law to be analyzed under the law of contracts. Group One, 254 F.3d at 1047.  The Federal Circuit instructs courts to look to the Uniform Commercial Code ("UCC") to determine whether a particular communication rises to the level of a "commercial offer for sale." Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc., 322 F.3d 1335, 1347-48 (Fed. Cir. 2003).  Because the UCC does not define the term "offer," the Federal Circuit approves of using the Restatement (Second) of Contracts, Corbin on Contracts, and The Law of Contracts by Calamari & Perillo, to aid in the application of "general contract law, widely shared by both state and federal courts," to

determine whether a particular communication is an offer.  <u>Group One</u>, 254 F.3d at 1048.

      1.      The March 6 Communication is a Quote, Not an Offer

          a.      Words of Offer or Promise

Whether a communication is an offer or a price quote is primarily a question of the parties' intent.  <u>Interstate Industries, Inc. v. Barclay Industries, Inc.</u>, 540 F.2d 868, 871 (7th Cir. 1976).  The law of contracts distinguishes between a quote and an offer.  Language suggesting a legal offer, such as "I offer" or "I promise" can be contrasted with language suggesting more preliminary negotiations such as "I quote."  Differing phrases are evidence of differing intent. <u>Restatement (Second) of Contracts</u> §§ 24, 26 (1981).  The word "quote" is commonly understood as inviting an offer rather than making one, even when directed to a particular customer.  <u>Rest. 2d Contracts</u> § 24, Comment C.

When one or more terms of a proposed bargain are left open, the parties manifest an intent not to be bound, and their communications should not be understood as an offer or as an acceptance.  <u>Rest. 2d Contracts</u>  § 33(3).  Incompleteness of terms is one of the principle reasons why price quotations are ordinarily not interpreted as offers.  <u>Rest. 2d Contracts</u>  § 33, Comment C.  On the other hand, if a quotation comes in reply to a specific request for an offer, contains language of commitment, or comes after prolonged negotiations, and the quotation contains detailed terms, it may be deemed an offer.  <u>Fisher Price, Inc. v. Safety 1st, Inc.</u>, 109 Fed. Appx. 387, 392 (Fed. Cir. 2004) (citing Joseph M. Perillo, <u>Corbin on Contracts § 2.2</u>, at 126 (Rev. Ed.1993)).  When determining whether a quote was intended as an offer, particular attention is given to whether the "purported offer uses words of offer, clearly expresses a quantity, or otherwise signifies to the recipient that a bargain may be sealed."  1 Williston on Contracts § 4:7

(4th ed.).

Cottrell's evidence of a commercial offer before the critical date consists of a quote by Cottrell on March 6, 2003, to Jack Cooper Transport for three different car haulers, a letter from Cottrell which accompanied the quote, and testimonial evidence by Cottrell's Vice Chairman Elwood Feldman ("Feldman"), and Gary Page ("Page") of Jack Cooper Transport.    The March 6, 2003 letter from Feldman to Page was provided in response to Page's request for a low-side trailer that would load like a high-side trailer.  Page Decl. ¶ 3.  The March 6, 2003 letter states "please find enclosed quotes" for three different models of car-hauling equipment.  Likewise, it states "thank you for the opportunity to submit these quotes."  The accompanying March 6, 2003, document says "QUOTE" at the top of the page in large print. Feldman and Page both refer to this communication as a quote each time they reference it in their declarations.  Feldman Decl. ¶¶ 9-12, Page Decl. ¶¶ 4-5.  This language suggests that Cottrell did not intend to make a commercial offer to Jack Cooper in its March 6, 2003 communication–it was merely a price quotation.

> b.    Open Terms

The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement.  See UCC § 2-204 and Comment.  A communication "will generally not be considered an offer unless it makes clear the subject matter of the proposed bargain; the price and the quantity of the proposed item involved; and the parties to the agreement."  Edwin D. Garlepp, "An Analysis of the Patentee's New Exclusive Right to 'Offer to Sell,'" 81 J. PAT. & TRADEMARK OFF. SOC'Y 315, 319 (May 1999).

On its face, the March 6 communication does not refer to the Jack Cooper prototype, or a

model C-11LST vehicle hauler.  The quote expressly offers three models of vehicle haulers: C-7512, CS8SUV and C-11LT.  Page and Feldman both testify that they understood that one of the C-11LT vehicle haulers would be the prototype C-11LST.  By its terms, though, the purported offer does not actually offer this model for sale.  The C-11LT quoted uses "aluminum hydraulic cylinders" to move the decks, rather than the telescrew which is the subject of this suit.

Furthermore, the March 6 communication fails to quote a price for the C-11LST.  Page testifies that he understood that the prototype C-11LST would be offered at the same price as the C-11LT listed on the quote.  Page Decl. ¶ 5.  However, on its face, the March 6 communication does not even refer to a C-11LST, much less provide a price for it.

The March 6 communication does contain specific terms for payment and delivery.  But those terms for payment and delivery relate expressly to the three models referenced and not the C-11LST.   This lack of specificity makes is less likely that the parties intended the March 6 communication to be a binding offer.

Communications similar to the March 6 letter have been found to be mere quotes rather than offers.  In Interstate Industries, Inc. v. Barclay Industries, Inc., 540 F.2d at 873, the court, in finding a communication between parties to be a quote and not an offer, emphasized that the letter advised the buyer of availability, referred to the communication as a price quotation, did not contain words of offer, and failed to mention quantity, time of delivery or payment terms.  Cottrell's March 6 letter to Jack Cooper has the same characteristics that the court relied on in Interstate, except that while Cottrell's letter includes payment terms, it does not state a specific price for the C-11LST.

When viewed in the light most favorable to Boydstun, Cottrell's use of the term "quote,"

Page 11 - FINDINGS AND RECOMMENDATION

its failure to use words of offer or promise, its failure to refer to the C-11LST or include a price for that model, and its omission of quantity terms weighs heavily against finding that Cottrell intended to make a commercial offer for sale in the March 6, 2003, communication to Jack Cooper.

        2.      The March 6 Communication is Not an Offer Because it Fails to State a Quantity

Under the UCC, an offer for sale need not contain all the material terms of the contract. However, "[t]he only term which must appear is the quantity term." U.C.C. § 2-201 Official Comment 1. Generally, a contract for the sale of goods must obligate the seller to deliver and the buyer to accept a definite quantity of goods. However, if the quantity is otherwise ascertainable with reasonable certainty, a contract for sale will be valid. See 10 Williston on Contracts § 29:16 (4th ed.).

The March 6 quote did not list a quantity. The letter sent by Cottrell to Page accompanying the March 6 quote did not list a quantity. The declarations of Page and Feldman do not introduce any parol evidence indicating that a quantity was intended and understood by the parties. Furthermore, Cottrell has never claimed that a term for quantity was included in the quote. Boydstun alleges that Cottrell's quote fails as a matter of law because it lack terms for both quantity and price. Boydstun's Memo in Support of Cross Motion for Summary Judgment at 21. While Feldman and Page both testify that price was included for the quoted models, but was subsequently redacted, Feldman Decl. ¶ 9, Page Decl. ¶ 5, Cottrell never disputed that quantity is not included on the face of the quote. Because no quantity was quoted by Cottrell, I must determine if there is an alternate basis for determining a quantity with reasonable certainty, sufficient to find the existence of a valid commercial offer for sale.

Page 12 - FINDINGS AND RECOMMENDATION

a.    Quantity Imprecisely Stated

A quantity may be found in the writings of the parties, even if it is not stated with specificity.  "[W]hen quantity is not precisely stated, parol evidence is admissible to show what the parties intended as the exact quantity . . . but where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term."  Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 794 (4th Cir. 1989) (citations omitted).  Parol evidence is admissible to establish quantity so long as words in the alleged contract have a "possible nexus to amount," such as "'all,' 'bags,' or even customary terms such as lot numbers."  Id. at 794-795.  Cottrell's March 6 quote does not contain any imprecise terms of quantity and, in fact, is completely silent as to quantity.

b.    Course of Dealing

A quantity may be ascertained from the parties' past course of dealing.  However, course of dealing cannot supply a missing quantity term if the contract is completely silent as to quantity.  See Simmons Foods, Inc., v. Hill's Pet Nutrition, Inc., 270 F.3d 723, 726-727 (8th Cir. 2001) (where contract silent to quantity, parol evidence cannot be used to supply missing quantity term) Thomas J. Kline, 878 F.2d at 795, ("[p]arol evidence cannot create quantity out of thin air, where the writing relied upon to form the contract is silent as to quantity").  Cottrell argues that the course of dealing between its company and Jack Cooper demonstrates that the March 6, 2003, quote from Cottrell was actually an offer by which, through simple acceptance, Jack Cooper could bind Cottrell to build and deliver car haulers.  Under the UCC, course of dealing may be introduced to explain missing or ambiguous terms because the parties' past course of dealing with one another is evidence of their intent.  UCC §§ 1-303(b), 2-202(a).

The only evidence of Cottrell's course of dealing with Jack Cooper are the declarations of Page and Feldman.  Page stated that he understood that if he accepted the quote, Cottrell would be bound to sell the units, including the prototype, at the quoted price.[2]  Page Decl. ¶ 5.  Likewise, Feldman stated that Jack Cooper could accept and bind Cottrell to deliver the units.  Feldman Decl. ¶ 9.  There is no evidence that their course of dealing would provide a precise term for quantity.  Additionally, I am unable to determine exactly what Page's "acceptance" of this quote would have bound Cottrell to deliver.  Even if Cottrell could have been bound by simple acceptance of the March 6 communication, the price quote lists three models of vehicle transporters, none of which is the C-11LST prototype.  While Cottrell may be able to present evidence of past sales for the three quoted models, they cannot establish a course of dealing quantity for the C-11LST, which Jack Cooper had never purchased and which was not even referenced in the March 6 communication.  When these facts are viewed in the light most favorable to Boydstun, Cottrell has not established a course of dealing whereby Cottrell's quote rises to the level of an offer.

c.    Course of Performance

Cottrell suggests that the quantity term might be deduced from course of performance.  Course of performance aids the court in interpreting a contract under the UCC because the subsequent course of performance is evidence of the parties' intent at the time of assent.  U.C.C. §§ 1-303(a) 2-202(a).  Cottrell offers testimonial evidence that Jack Cooper eventually ordered 25 C-11LT units, one of which was the prototype C-11LST unit.  Feldman Decl. ¶ 9., Page Decl. ¶ 5.  The inference from this course of performance would be that because Jack Cooper

---

[2]Presumably the quoted price is for the model C-11LT.

eventually ordered 25 car haulers, the court can infer an offer for 25 car haulers, including at least one prototype C-11LST unit.  However, Cottrell has offered no evidence that the quote was for 25 units.  Additionally, the quote lists three different models of car haulers:  C-7512, CS8SUV and C-11LT, and there is no evidence that Jack Cooper purchased the other quoted models.  Viewed in the light most favorable to Boydstun, these facts are insufficient to establish quantity through course of performance.

d.    Indefinite Quantity and Requirements Contracts

In general, a supply contract is either a definite quantity contract, an indefinite quantity contract, or a requirements contract.  Even though the March 6 communication from Cottrell does not state a definite quantity, it may still rise to the level of a commercial offer for sale if it proposed either an indefinite quantities contract or a requirements contract.

The first exception to the rule that an offer must state a definite quantity is an indefinite quantity contract with an ascertainable minimum.  This frequently arises under government services contracts, where a service provider is bound to be ready to supply services, but no minimum quantity of services is explicitly stated.  In order to find mutuality of contract, the court looks for a basis to determine some minimum quantity of services that must  be purchased and provided.  See Howell v. U.S., 51 Fed. Cl. 516 (2002) (indefinite quantity contract for mowing and maintenance service was enforceable because there was an ascertainable minimum quantity); Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302 (Fed. Cir. 1998) (contract for extermination services did not have an ascertainable minimum and was unenforceable).  This exception is usually applied to services contracts and not to contracts for the sale of goods. Here, the proposed bargain was for a sale of goods, rather than a contract for services.

Furthermore, the March 6 communication contains no basis for ascertaining a minimum quantity.  Jack Cooper was quoted three models of car haulers.  Clearly if they were going to order any or all of them, they would have had to order at least one.  However, this is not an offer for an indefinite quantity contract with a stated minimum.  Although Jack Cooper bought 25 C11-LT car haulers from Cottrell, there is no evidence that they purchased the other two models quoted, or that they would have been obligated to buy one of each if they accepted Cottrell's price quote.  To hold that an unlimited quantity contract with a stated minimum can be inferred by reading the March 6 quote as "one of each" would destroy the distinction between quotes and offers in the law–an unlimited quantity contract with a minimum of one could always be inferred from a price quote.

The second exception to the rule that an offer must state a definite quantity is a requirements or output contract for the sale of a commodity.  U.C.C. § 2-306.  A requirements contract differs from an indefinite quantity contract in that an indefinite quantity contract requires the buyer to purchase a minimum quantity from the seller, whereas a requirements contract obligates the buyer to purchase all of its required goods from the seller.  Varilease Technology Group, Inc. v. U.S., 289 F.3d 795, 799 (Fed. Cir. 2002).  Cottrell has not presented any evidence that the March 6 communication proposed a requirements contract.  Nor have they presented evidence that Jack Cooper would have been obligated to purchase all of its car haulers from Cottrell and could not have purchased some of its car haulers from other manufacturers.  Because there is no evidence in the record that a requirements contract was intended, this exception is inapplicable to the present case.

The March 6 communication meets none of the exceptions to the rule that an offer must

state a definite quantity or provide a basis for determining quantity.  Under the March 6

communication, the quantity of car haulers that Cottrell would furnish to Jack Cooper would

have been dictated entirely by Jack Cooper's needs.  No quantity was listed on the quote, and I

can find no other alternative basis for discerning a term for quantity.  Cottrell's March 6, 2003

communication to Jack Cooper was a quote, and would not create an enforceable contract if Jack

Cooper had "accepted" it because it fails to list a quantity and lacks mutuality of obligation.

### 3.    Summary

Cottrell has failed to establish that its communication to Jack Cooper Transport on March

6, 2003 is a commercial offer for sale that would satisfy the on sale bar.  Cottrell calls this

communication a quote, Feldman and Page refer to the communication as a quote, and no

quantity is included in or able to be inferred from the communication.  Therefore, the March 6

communication from Cottrell to Jack Cooper is a quote, not a commercial offer for sale.

Cottrell's motion for summary judgment on the on sale bar should be denied.

### 4.    Boydstun's Cross Motion

To consider Boydstun's cross-motion for summary judgment, the court must construe the

facts in the light most favorable to Cottrell.  Fed. R. Civ. P. 56; <u>Fair Housing Council</u>, 249 F.3d

at 1136.  Having found that Cottrell's March 6 communication fails as a matter of law as an

offer, and there being no facts in dispute, Boydstun's motion for summary judgment should be

granted.

///

///

///

Page 17 - FINDINGS AND RECOMMENDATION

B.      Ready for Patenting

Even if the invention was the subject of a commercial offer, I would still recommend

denying Cottrell's motion for summary judgment because Cottrell has not established, as a matter

of law, that its telescrew was ready for patenting by the critical date of March 29, 2003.  A party

may prove that an invention is ready for patenting by showing (1) "proof of reduction to practice

before the critical date," or (2) "proof that prior to the critical date the inventor had prepared

drawings or other descriptions of the invention that were sufficiently specific to enable a person

skilled in the art to practice the invention." Pfaff, 525 U.S. at 67-68.  There is no evidence that

Cottrell reduced their design to practice before the critical date, so the question is whether

Cottrell has presented sufficient drawings or other descriptions, created prior to the critical date,

that would "enable a person skilled in the art to practice the invention." Id.  There are at least

two ways in which Cottrell fails to meet its burden on this issue.

First, there is ambiguity as to *what* may have been ready for patenting.  Cottrell's

evidence of patentability consists of meeting notes of Cottrell's Vice President of Engineering,

Brian Howes ("Howes"), from February 21, 2003 with the notation "screw on teletube FRUT?,"[3]

undated sketches from Gerard Biagi ("Biagi"), an Engineering Project Manager for Cottrell,

depicting a telescrew, and testimony from Howes that he saw Biagi's sketches at a meeting on

February 26, 2003.  Although these sketches depict a screw actuator device, they do not show

how the device would be used or even whether it would be used in a vehicle hauler.  Cottrell has

presented testimonial evidence of Howes, Biagi, and Feldman, that the telescrew was designed in

_____

[3]Cottrell claims that "FRUT" means Front of Rear Upper Track, indicating the suggested
placement of the teletube.  Cottrell also explains that "screw on teletube" indicates their concept
to use a screw actuator, and describes the device which eventually was called the telescrew.

Page 18 - FINDINGS AND RECOMMENDATION

response to Page's desire to purchase a low-side trailer with the loading capacity of a high-side trailer, and this trailer eventually became known as the Jack Cooper Prototype, or C-11LST. However, construed in the light most favorable to the non-moving party, these facts are insufficient to establish that Cottrell's use of a screw actuator device in a vehicle transporter was sufficiently developed by the critical date to "allow one skilled in the art" to practice the invention. Id.

Second, there is also ambiguity about the *date* of patentability. At oral argument, both parties agreed that Cottrell delivered a vehicle hauler using screw actuators to Jack Cooper in October 2003. The question for summary judgment under the on sale bar, however, is whether the invention was sufficiently depicted in drawings or descriptions that a person skilled in the art could have created a vehicle hauler using screw actuators by March 29, 2003. Id. Howes' meeting notes with the notation "screw on teletube FRUT?" are dated February 21, 2003. Biagi's sketches of the screw actuator are undated, but Biagi and Howes both testify that these drawings were presented at a February 26, 2003 meeting. The undated sketches, cryptic meeting note, and testimony by Cottrell employee's does not establish by clear and convincing evidence that the design of the teletube was sufficiently developed by the critical date. At best, it establishes that the design process was underway by the critical date.

As further proof that their design was complete and ready for patenting, Cottrell points to the absence of notations about the telescrew in meeting notes from March 26, 2003. Cottrell argues that the absence of a reference to the telescrew confirms that the design was ready for patenting; the logic being that the design team would have discussed the telescrew if it were not yet complete. However, the absence of a notation about the telescrew is not clear and

Page 19 - FINDINGS AND RECOMMENDATION

convincing evidence that the device was ready for patenting by the critical date.

Additionally, Cottrell has presented an AutoCAD file as evidence of a patentable design with a created date of January 18, 2003. This file also has a modified date of January 8, 2004. Viewed in the light most favorable to the non-moving party, this evidence is insufficient to resolve the question of *when* Cottrell's screw actuator was sufficiently developed to be ready for patenting. Overall Cottrell also fails to adequately support its motion for summary judgment on patentability, the second required condition of the on sale bar.

C.      Does the Alleged Offer Embody All Claims

If both elements of the Pfaff test are met, the court must determine whether the subject matter of the offer for sale embodies the claims of the patent. Scaltech, 269 F.3d at 1329. Even if Cottrell could establish that its C-11LST car hauler was subject to commercial offer for sale and was ready for patenting before the critical date, I would still recommend denying its motion for summary judgment as premature because claim construction has not taken place yet, and there are unresolved material questions of fact on the issue of embodiment.

Cottrell argues that it can accept Boydstun's claim construction for the purposes of this motion only, and reserve claim construction for later in the proceedings, if necessary. Allowing Cottrell to stipulate to Boydstun's claim construction one moment and then argue a different claim construction the next defeats the purpose of claim construction. Summary judgment should not be granted solely on Cottrell's stipulated claim construction. Dana Corp. v. American Axle & Manufacturing, Inc., 279 F. 3d 1372, 1376 (Fed. Cir. 2002) (error to grant summary judgment invalidating a patent based on an adopted claim construction from one of the parties). Without claim construction of Boystun's '547 patent, this court cannot discern, as a matter of law,

Page 20 - FINDINGS AND RECOMMENDATION

whether Cottrell's C-11LST embodies all the elements of Boydstun's '547 patent.

IV.    Prior Invention

Cottell also moves for summary judgment on prior conception under 35 U.S.C. § 102(g). Under 35 U.S.C. § 102(g), "[a] person shall be entitled to a patent unless . . . . before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it."  A party asserting invalidity under Section 102(g) must overcome an issued patent's presumption of validity by establishing clear and convincing evidence of prior invention.  Apotex USA, Inc. v. Merck & Co., Inc., 254 F.3d 1031, 1036 (Fed. Cir. 2001).

In order to establish prior invention under 35 U.S.C. § 102(g), a party must demonstrate prior reduction to practice, or prior conception coupled with reasonable diligence in reducing to practice.  Mycogen Plant Sci. v. Monsantao Co., 243 F.3d 1316, 1332 (Fed. Cir. 2001). Conception is the "formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is applied in practice."  BJ Services, Co. v. Halliburton Energy Service, Inc., 338 F.3d 1368, 1373 (Fed. Cir. 2003).  Additionally, "[c]onception must be proved through corroborating evidence which shows that the inventor disclosed to others his 'completed thought expressed in such clear terms as to enable those skilled in the art' to make the invention."  Coleman v. Dines, 754 F.2d 353, 359 (Fed. Cir. 1994).  Oral testimony by interested parties offered on prior invention must be corroborated.  Schumer v. Laboratory Computer Systems, Inc., 308 F.3d 1304, 1316 (Fed. Cir. 2002).  Sufficiency of corroboration is determined by using a "rule of reason."  Price v. Symsek, 988 F.2d 1187, 1195 (Fed. Cir. 1993).

Page 21 - FINDINGS AND RECOMMENDATION

A.        Cottrell's Conception of Telescrews

Cottrell contends that on February 21, 2003, it conceived of a device that Cottrell refers to as a telescrew, which uses screw actuators to move the decks of a vehicle hauler.  Cottrell alleges that its telescrew is the same device as Boydstun's screw actuator, covered under the '547 patent.  Cottrell claims that it conceived of the telescrew before Boydstun conceived of its screw actuator and filed its patent application, such that claims 27 and 29 of the '547 patent are invalid.

Cottrell's employees testify that the design and development of the telescrew arose in response to a desire by one of Cottrell's customers, Jack Cooper Transport, for a low-side trailer that had the loading capacity of a high-side trailer, such that the upper track could be lifted high enough to allow vehicles to drive underneath and be loaded onto the lower decks of the trailer. Cottrell alleges that it began design of this trailer in January 2003 and that it became known as the Jack Cooper Prototype (Model C-11LST).  During the first three months of 2003, Cottrell's engineers held a series of meetings to discuss the design of the Jack Cooper Prototype and items discussed during some of these meetings were recorded by Howes.  Cottrell argues that Howes' notes for one meeting that occurred on February 21, 2003, reflect that Cottrell conceived of the idea of the telescrew to solve the engineering challenge associated with raising the rear upper track on a car hauler.  Specifically, Cottrell's engineers suggested using a teletube system powered by a screw to move the front of the rear upper track on a vehicle hauler.  After the February 21, 2003 meeting, Biagi began developing a series of drawings and sketches that illustrated the design of the telescrew.  These drawings and sketches were created during the last week of February and first week of March 2003.  See Biagi Decl., Exhs. 4-7.  Cottrell alleges that one of the drawings has identical elements to those elements recited in claims 27 and 29 of

the '547 patent.

On March 6, 2003, Feldman delivered a quote to Page of Jack Cooper Transport.  See Exh. 1 to Feldman Decl.  Cottrell alleges that the offer included a firm commitment by Cottrell to build and deliver some number of trailers including one new prototype that would include the telescrew design.  Cottrell built the Jack Cooper Prototype in the summer of 2003, using two telescrews they fabricated for the prototype.  The Jack Cooper Prototype was completed in August 2003 and delivered to Jack Cooper Transport on October 23, 2003.  Cottrell argues that this evidence establishes reduction to practice by October 23, 2003, and an earlier conception date of February 21, 2003.

> B.    Boydstun's Conception of Screw Actuators

Boydstun contends that Rob Boydstun conceived of the invention of a vehicle transporter with screw actuators in late December  2002 or early January 2003, and that his conception was complete in that it included every feature of the invention set out in claims 27 and 29.  Boydstun Decl. ¶¶ 3, 7.  Cottrell argues that Rob Boydstun's conception is not "new" in that other screw devices have been used on car haulers for years.  Cottrell also argues that Boydstun's conception is not sufficiently corroborated.

Rob Boydstun testified that over the Christmas to New Year's holiday of 2002 to 2003, he built a prototype of his conception of a screw actuator in his home shop.  Some of the parts he used came from Boydstun Metal Works and he brought these parts home to build the prototype because he wanted to show his engineering staff a working model of his conception of a screw actuator that would replace hydraulic cylinders for lifting and lowering the support members for cars on vehicle transporters.  Following the New Year's holiday, Rob Boydstun brought the

prototype to work and hooked it up to a hydraulic pump to run the screw actuator up and down. After running the screw actuator, the prototype was disassembled and digital photographs were taken. See Exh. 1 to Huey Decl. The digital photograph files are dated January 7, 2003. Boydstun employee John Huey ("Huey") took the photographs using a Boydstun digital camera which he then returned to Boydstun employee Mark Mecklem ("Mecklem"). Mecklem saved the files to a computer server and sent an email on January 7, 2003, to Huey to alert him as to where the electronic files of the photographs were saved. Boydstun contends that this evidence establishes that Boydstun conceived of its screw actuator in January 2003.

C.      Analysis

"Priority of invention goes to the first party to reduce invention to practice unless the other party can show that it was first to conceive invention and that it excercised reasonable diligence in later reducing that invention to practice." Price, 988 F.2d at 1198. A patentee is entitled to a constructive conception date as of the filing of its patent application. Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1577 (Fed. Cir. 1996).

Boydstun filed its patent application for the '547 patent on March 29, 2004, and is entitled to a constructive conception date of March 29, 2004. To rely on an earlier conception date, a patentee must show that it had conceived of its invention prior to the filing date. Id. at 1576-77. At oral argument, both parties agreed that Cottrell delivered a vehicle hauler using telescrews to Jack Cooper in October 2003. If the C-11LST prototype vehicle transporter manufactured by Cottrell and delivered to Jack Cooper embodied all elements of the claims, delivery of the transporter would establish reduction to practice by October 23, 2003, before Boydstun's constructive conception date. Furthermore, Cottrell argues it conceived of the

Page 24 - FINDINGS AND RECOMMENDATION

invention even earlier in February or March 2003, as demonstrated by various meeting notes, sketches, and testimony.  On the other hand, Boystun claims it conceived of the invention some time during December 2002 or January 2003, and that Rob Boydstun reduced the invention to practice by building a working prototype by January 7, 2003.

         1.      Cottrell's October 23, 2003 Delivery of the Jack Cooper C-11LST

It is undisputed that on October 23, 2003, Cottrell delivered to Jack Cooper a prototype C-11LST vehicle hauler which used telescrews to move the vehicle hauler decks.  However, the evidence before the court on this motion does not conclusively establish how the telescrews are used in the C-11LST.  Additionally, because there has been no claim construction on the '547 patent, even if I could determine exactly how the telescrews in the C-11LST functioned, the evidence before me does not determine conclusively whether the C-11LST embodies claims 27 and 29 of Boydstun's '547 patent.  Cottrell's October 2003 delivery of the prototype to Jack Cooper is not dispositive.  Summary judgment is inappropriate because there has been no claim construction, and because there is still a material question of fact as to whether the C-11LST delivered in October 2003 uses telescrews in the manner embodied in claims 27 and 29 of the '547 patent.  See discussion supra pages 19-20.

         2.      Boydstun's January 7, 2003 Photographs

Even if Cottrell established that the C-11LST delivered in October 2003 embodied all aspects of the '547 patent and therefore established a date of prior conception of October 2003, Boydstun has alleged that it conceived of the invention even earlier, with a claimed conception date of January 2003.  Boydstun has presented photographs of a screw actuator dated January 7, 2003, along with testimony by the inventor about the design process, testimony from Boydstun

Page 25 - FINDINGS AND RECOMMENDATION

employees who witnessed the test of the prototype in January 2003, and who photographed the prototype in January 2003.  Although it is unclear from the photographs how the screw actuator was to be used, Rob Boydstun testified that the screw actuator photographed was designed for the purpose of moving the decks of vehicle haulers.

Cottrell argues that Boydstun's evidence is insufficient to establish prior conception. First, there has been inconsistent testimony about the make of the digital camera used to take the January 7, 2003 photographs.  Additionally, Cottrell points out that there is no evidence that the electronic file date of January 7, 2003 is accurate.  However, because Cottrell alone has moved for summary judgement on the issue of prior conception, I do not have to decide whether Boydstun has actually established its date of conception by clear and convincing evidence. When viewed in the light most favorable to the non-moving party, Boydstun's evidence of conception in January 2003 is sufficient to create a material question of fact as to whether Boydstun conceived of the invention before Cottrell.  Thus summary judgment on Cottrell's claim of prior conception should be denied.

   3.  Corroboration of Cottrell's February and March 2003 Evidence

Boydstun also argues that Cottrell's evidence of conception in February and March 2003 is insufficiently corroborated to support summary judgment in Cottrell's favor.  I agree.

First, Cottrell has presented Howes' meeting notes dated February 21, 2003, with the notation "Screw on teletube FRUT?"  Testimony of Cottrell employees explains that this cryptic notation signifies that they were discussing the use of a teletube to be attached to the front of the rear upper track of a vehicle hauler.  Standing alone, the notation appears to be more of a suggestion or a question, rather than the expression of a completely embodied conception.

Page 26 - FINDINGS AND RECOMMENDATION

Furthermore, these notes lack any reference to Jack Cooper Transport, a C-11LST, or Feldman's requested design.  Additionally, these notes contain other cryptic references to telescrews that are unexplained by Cottrell employees.  For example, the February 21, 2003 meeting notes also say "FRUT-Teletubes."  The February 26, 2003 meeting notes also have the notation "Review LT5 Lift Front & Rear - teletube lift front? or have fixed pivot at rear?"  These notations do not clarify why Cottrell was designing telescrews, and leave open questions as to whether they were designed for a C-11LST prototype, or for another application altogether.  Although meeting notes are documentary evidence, and the courts do not require corroboration where a party seeks to prove conception through the use of physical exhibits, <u>Mahurkar</u>, 79 F.3d at 1577 (citations omitted),  here the documents require corroboration since they have no meaning apart from the explanatory testimony of Cottrell's own employees who were co-inventors of the telescrew.

Second, Cottrell has presented undated sketches by Biagi depicting various screw assemblies.  Cottrell employees have testified that they saw these sketches at a meeting on February 26, 2003, and that they were presented as part of a discussion about the Jack Cooper prototype.  These sketches depend on testimony by Cottrell's employees to show a date of conception.  Additionally, since these are just sketches of screw assemblies, it is unclear for what application these sketches were prepared, whether they would be used in a vehicle hauler and, if so, whether they would be used to move the decks of a vehicle hauler.  The sketches alone do not establish by clear and convincing evidence that Cottrell's conception embodied claims 27 and 29 of Boydstun's '547 patent.

Third, Cottrell has presented an AutoCAD file with a "created" date of January 18, 2003.  This file has a "modified" date of January 8, 2004.  Biagi testified that this file eventually

Page 27 - FINDINGS AND RECOMMENDATION

contained the designs for the Jack Cooper C-11LST. However, because of the disparity between the file's created date and last modified date, it is unclear how much of the design was complete in early 2003. The AutoCAD file does not sufficiently corroborate the testimony of Cottrell employees about the design process.

Fourth, Cottrell claims that a price quote from Rockford Ball Screw emailed to Biagi on March 7, 2003 for "BM30 Bearing Mount[s]" corroborates testimony about the design process. Biagi explains that he would not have been soliciting quotes for parts for the telescrew unless the design was complete. Biagi Decl. ¶ 17. Biagi also claims that the BM30 Bearing Mounts eventually became part number 10416 on the engineering schematic. Att. 10 to Biagi Decl. The price quote from Rockford and Biagi's testimony may provide circumstantial evidence of conception, but it does not establish the complete embodiment of Cottrell's conception by clear and convincing evidence.

D.    Summary

Cottrell's motion for summary judgment on the issue of prior conception under 35 U.S.C. § 102(g) should be denied because there are unresolved material questions of fact. Cottrell has not established by clear and convincing evidence that the C-11LST delivered to Jack Cooper on October 23, 2003 embodied claims 27 and 29 of the '547 patent. Even if Cottrell could establish reduction to practice in October 2003, Boydstun's evidence of conception in January 2003 is sufficient to create a material question of fact as to who first conceived of using screw actuators in a vehicle transporter. Summary judgment is also inappropriate because Cottrell's evidence of conception in February and March 2003 is insufficiently corroborated to prove conception by clear and convincing evidence.

Page 28 - FINDINGS AND RECOMMENDATION

CONCLUSION

For the reasons set forth above, this court recommends denying Cottrell's motion for summary judgment (#71) as to claims 18-26 and 28 as moot, denying Cottrell's motion for summary judgment as to claims 27 and 29, and granting Boydstun's cross motion for summary judgment on the on sale bar defense (#81).

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due April 30, 2007.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 13th day of April, 2007.


    /s/  Paul Papak
Honorable Paul Papak
United States Magistrate Judge


Page 29 - FINDINGS AND RECOMMENDATION